No. 23-282, Korrolli v. Metropolitan Dental Associates, D.D.S.- 225 Broadway, D.D.S. Okay, good afternoon. Let me just wait for the door to close. Okay, Mr. Bergstein. Good afternoon. Stephen Bergstein for the plaintiff appellant. We have a multitude of issues here, but let me focus for now on the new trial order. And if there's time, I'll talk about the retaliation claim. The district court abused its discretion in ordering a new trial in this sexual harassment case. The district court primarily cited three reasons for its order. First, the district court said there was prejudicial hearsay, admitted a trial. Second, the district court said plaintiff's evidence in support of her own claim was relatively limited. And third, the district court took issue with the size of the damages awards that the district court thought was evidence that the jury was motivated by irrelevant factors. None of these justifications withhold scrutiny, withstand scrutiny. First, plaintiff's case of sex harassment was much stronger than the district court had suggested in its new trial order. The district court did note that plaintiff had enough evidence of sexual harassment to survive judgment as a matter of law. That's in the new trial order of December 15, 2022. So that alone shows that there was enough evidence for plaintiff to win. But take a look at what plaintiff testified to. She testified to that at least every other day for six years, Mario made unwanted sexual advances in a variety of ways, including physically trying to physically maneuver her into a vacant office for sexual liaisons, touching her body, commenting on her physical appearance, telling her he loved her. This testimony was corroborated by plaintiff's mother, who also worked there and saw this. And she testified she saw this, quote, many times, touching my daughter on the butt area, opened the door once to a vacant office and saw Mario, quote, very close to the plaintiff. And then Mario got angry when the mother walked in. Plaintiff personally saw Mario. It says that there's only a couple of specific instances, but then she testifies generally. Right. So there's a specific instance of when she's coming back from the gym on the on the elevator. And then there's an instance where she goes into a closet or something or a vacant office and then he wipes a tear away and, you know, touched her face. There's that interaction. Right. So the only specific instances to which she testifies, except, you know, him berating her over her work performance and things like that. So couldn't the district court have said, actually, that record is really thin on sexual harassment, even though it wouldn't mean that the other side was entitled to judgment as a matter of law? Absolutely not, because plaintiff did say that he was harassing me, touching me, making comments, trying to get me into these offices almost every other day for six years. Now, this court has said many times that that's enough to make out a sex harassment claim. You don't have to tell the jury dates and times of every occasion when you were harassed. That's the nature of a hostile work environment. They were doing it all the time. I see a lot of cases where summary judges... If there's enough evidence of that, why did the plaintiff emphasize, you know, the serial harassment? You know, there's the comment in the summation about serial harassment or emphasize these other instances if, in fact, there was enough evidence of harassment against Caroli in particular. Because she testified that it was happening all the time for six years. That's enough. Right, but the district court said that couldn't be admitted for truth, that it was happening to other people, right? Well, she personally... There actually wasn't evidence that he was a serial harasser, right? Because it was only admitted to show her state of mind, not for the truth that there were other women being harassed. But she did personally see Mario sexually harass four other women. Plaintiffs testified to this with her own two eyes. It wasn't simply, I heard... That's not an actionable part. That's not an actionable part, is it? It is, because that's relevant to the hostile work environment. This court has said that even if the plaintiff herself was not present or was not the target of some of the remarks, that's enough to make out a hostile work environment claim. And she saw what Mario was doing to other women. She saw Mario take other women into these offices for sexual liaisons. She knew that's what he was trying to do to her. That plays into the overall hostile work environment. He's doing it to me. He's doing it to these four other women. I've seen it. This is what's going on here. She complains to Cohen about the environment, and Cohen tells her in vulgar terms, I don't want to hear about this, go back to work, you're effing crazy. So it's not simply plaintiff testifying, oh, I heard about this, or there's rumors, or somebody told me. She saw it with four other women. One of the women, Marina, he saw Marina pull her off the floor for 20 minutes. She emerged from the empty office with her lipstick smudged. She saw them chest to chest, her lab coat down to her shoulders. This is stuff plaintiffs saw personally. This is not speculative. This is not hearsay. This is what plaintiffs saw. So when the district court says that there was all this hearsay, that's overstating it. As I go through the record, there were four limiting instructions as to the plaintiff about Mario's sexual activity. I have a recent conclusion that the limiting instructions were not followed. There was so much hearsay that it overwhelmed the case. And how are we supposed to second guess that decision by the district judge? I mean, the district judge is there. She sees the case. It's unusual for district judges to order retrials in their own cases. It's so unusual that we almost never see it because the solution is to give limiting instructions that we presume the jury follows, and then if you think the damages are too high, you enter a remitter. But the limiting instructions as to plaintiff, I count four of them, all of them for their impact on plaintiff. Only once did the district court strike plaintiff's testimony about the harassment. That's not uncommon in sex harassment cases or civil rights cases. I know this court has reviewed a lot of transcripts. I've reviewed dozens of transcripts in my life. I always see trial transcripts as limiting instructions. Occasionally somebody testifies to something that the judge strikes it out because it's not relevant or the witness blurted it out. It's not unusual to read a transcript with this sort of ‑‑ with these sorts of limiting instructions, and we presume that the jury follows limiting instructions as case after case that say that you can't have a trial without limiting instructions, without presuming the jury follows. There is a presumption that the jury follows limiting instructions, but that presumption can be overcome. I mean, the district court here was convinced that the jury did not follow the limiting instructions, right? On the basis of downplaying the strength of plaintiff's case, on the basis of overstating the nature of the hearsay, and on the basis of the district court's finding that the damages were just too high and that if you award damages like this, it can only mean that the jury was driven by emotion and that it was swayed by irrelevant factors. You're not saying that that is an impossible consideration, right? So if somebody had very little ‑‑ if in fact somebody had very little evidence of something that happened to her but testifies that she heard a rumor that something very serious happened to a lot of people and then the jury returns an award of like $20 million, couldn't the district court then just say, well, the jury must have thought about the horrible thing that was based on hearsay and not the thing that happened to her? So in principle, it would not be impermissible. Correct. Fortunately ‑‑ You're saying in this case it was not correct. Right. Fortunately, Your Honor's hypothetical is not her case, but that can happen, right? There's always a safeguard if you talk about ‑‑ So it's not impermissible for the district court to look at the damages award and say the jury must have credited a hearsay testimony in order to reach that number. You're saying the district court just shouldn't do it here. So what's the principle where we distinguish between the case where it would be allowed in this case? When you have significant evidence of six years of a hostile work environment that's corroborated not only by the plaintiff but by her own mother's testimony, plaintiff saw it happen to other women and then the plaintiff testifies to significant pain and suffering. You know, her damages testimony went off the pages and her mother corroborated this. She had panic attacks. She wanted to die. She was disfiguring her face. She went through Mario's mind games for six years. He would harass her. She would complain. Mario would try to get her fired. And then the cycle would start all over again. He would say, I didn't really mean it. Before your time runs out, I wanted to just kind of focus on one thing. In deciding the summary judgment motion, the district court came to the conclusion that there was no protected activity, and therefore that retaliation would not be sustained. Let me address that. Before you – I haven't asked the question. I want to know what the – whether – it seems to me a point in your favor, this is going to be a softball, is that she didn't take into account not just the statements that she might have said, you know, back off and resisting whatever might have occurred, but specifically reports that she gave to Dr. Cullen, which were verbal reports. And the district court didn't address those. And those would be protected activity, would they not? Yes, they would. That's – It seems to me that that's a problem for the other side. Yes, it is, because we know that verbal complaints are protected. And the district court, interestingly, in the new trial order, did say that the trial record shows Caroli testified that she told Dr. Cullen multiple times that she was being sexually harassed. That's special appendix 23. So the district court recognized that in the new trial order. But that very – But didn't Caroli in her deposition say she never explicitly complained that Morantes was subjecting her to sexual harassment? No. Page 90 of the joint appendix, deposition page 86, questions. So at some point you go to Dr. Cullen about these perceived sexual advances from Mario, correct? Answer, correct. And that exchange happened a couple of times in her deposition. Well, on page 88, she says she never explicitly said it. So she complained in some sense, but not explicitly. But she also said – well, you have that in depositions. But question page 94, you indicated you complained to Dr. Cullen about Mario's alleged sexual advances, correct? Correct. She said, I will not submit to sexual advances in order to get ahead in this office like other women are. So to the extent Your Honor's question raises an ambiguity about her testimony – Are those statements just irreconcilable? Or what does it mean on page 88 when she says she never explicitly complained about sexual harassment? I thought that the context of that answer, that there was a context of that answer and that shortly thereafter she did explicitly say, when asked did you go to Dr. Cullen about these perceived sexual advances, she said yes. Okay. She said yes. But in response, when asked what did she say, nothing in the political response of what she said actually mentioned. There's no mention of a sexual advance, though. Except page – It's about work – I'm looking at page 86, 87, 89. And I just – I know that there are characterizations that are here, but specifically what she enumerates in some of the testimony that she captures or that you're summarizing as sexual advances are often speaking to a general work condition or harshness that she's experiencing and not anything of a sexual nature. Page 90 of the Joint Appendix at 87, 88, quote, she told Cullen, quote, I'm not going to be put in a position where I have to be sexually involved in order to keep my job here, and that Orantes was having sex with her female subordinates, allowing them to get away with everything for which she was taking the blame. And I understand that, but there's no specific communication that she makes there in that passage, that reading, that she was, in fact, harassed. And I'm not speaking to another area of testimony, but when I'm looking at these particular cited citations that are then captured and summarized, often when looking at the actual testimony, there's not actually a direct quotation that is sexual in nature. Except what I just read back to the court comes pretty close, that I'm not going to subject myself, I'm not going to be sexually involved with Mario as a means to get ahead. What does Dr. Cullen think? I guess I'm making a distinction between her impression of what she might be testifying, she might have seen with respect to another coworker, and what she is experiencing herself, in fact. And that's what I'm specifically asking about. All I can say is she testified that she went to Dr. Cullen about his unwanted sexual advances. She said yes. If there's any ambiguity in the deposition transcript on this issue, in a summary judgment case, we resolve that in favor of the plaintiff. And we know from the post-trial ruling that the judge credited that plaintiff did in fact tell Dr. Cullen that Arantes was sexually harassing her. That corroborates what we've been saying from the summary judgment record. Okay. Thank you. We'll hear from you again, but let's turn to the appellee, Mr. Wims. Good morning. David C. Wims for Defendant Appellees. I want to begin by just speaking to several things that Mr. Bergstein gracefully stated. First of all, with respect to the district court's grant of summary judgment to defendants, and the specific finding that no protected activity had been engaged in by plaintiffs, your honors made reference a moment ago to the fact that very specifically plaintiffs said in their deposition, I never explicitly complained about sexual harassment. Well, she says I never explicitly complained about it, but then as Mr. Bergstein points out, she says I'm not going to submit to sexual advances in order to get ahead. I mean, isn't the implication of that pretty clearly somebody's asking me to submit to sexual advances to get ahead? With all due respect, Judge, the implication could be that. But implications by definition. What's the innocent implication? That she believes she's seen others being harassed and that Mr. Arantes was harassing other women, for example. If you acknowledge that the implication could be that, that it could have been a complaint about sexual harassment and it's a summary judgment motion, shouldn't we make the inference that favors Carolling? Well, to be clear, if there was nothing in the record that contradicted that, you may have a point here. But she specifically disavows it in her deposition. And her testimony, she never saw any sexual harassment of any other person. Well, Mr. Bergstein just said that she personally witnessed the sexual harassment of four people. So why don't you explain to me why that's not correct? Okay. The reason is I asked her repeatedly at trial, did you ever see him kiss, hug, grope, or fondle any person? She said no. She'd say, oh, they were in the room. I came out. I saw her lipstick smudged. That doesn't establish anything. It doesn't establish anything? Well, no, it doesn't. I would say it doesn't, Judge, because I'm sorry. Most people don't go into a room to smudge the lipsticks themselves. No, they don't, Judge. However, there's no, she didn't have any firsthand knowledge of what occurred in those rooms. The fact that she concluded that sexual harassment was going on is not evidence. Her testimony, that's not evidence. It's certainly not admissible evidence because she didn't see it. She had no firsthand knowledge. Similarly, Mr. Bergstein just argued, said, where a mother saw, her mother testified at trial, she saw nothing. She said, I never saw it. I was outside. They'd go in the room. So whatever speculation the two of them engaged in with respect to what would occur behind closed doors is not appropriate consideration for the trial court with respect to what plaintiff proved. Now, regarding Hypothetically, a plaintiff or individual is vehemently rebuffing their supervisor's overtures, sexual overtures. Is there a place or a space at that, at some point, where that rejection would make it or can be interpreted sufficiently clear to then fall into protective activity? I believe that it could, yes. But in this particular instance, there is no testimony. She didn't say she was vehemently objecting to advances. She specifically testified he never groped her. There was never a request for a date. There was never any, you know, attempts to fondle her. He testified that he touched her in the elevator, right? He said he loved her. He, like, wiped tears off her cheek and all of that stuff. So when she says you need to back off, you know what I'm talking about. Isn't she referring to that? Well, I think the issue is not what she was referring to. The issue is what the recipient of that declaration perceived it as. So the issue is not. Or maybe what a reasonable person would have said. Exactly. And so the reality of the situation is she saw no one else get sexually harassed. Well, I guess my question is when she says you need to back off, you know what I'm talking about, what is she referring to there? She's referring to the laundry list of workplace grievances that she repeatedly testified to with respect to Ms. Durante's being a difficult manager to work for. So he, you know, calls her into the office and berates her about her work performance. And so you're saying maybe, you know, he could have understood it as referring to that. That could be reasonably understood as objecting to his management style with respect to the imposition of discipline. And most importantly here, what she says is, I never explicitly told Dr. Cohn that he sexually harassed me. Now, if you, if she were to say, I need you to, as you just quoted, she says, look, I need you to back off. You have to be more specific. I mean, the idea behind the protected activity is that it has to place the recipient on notice that there's possible illegal conduct afoot. The context there. It's actually kind of funny that, you know, if all he were doing was engaging in sexual contact, then you need to back off would refer to the sexual contact. But you're saying because it was also an obnoxious boss who berated her over her work performance, that it's actually ambiguous. Well, I, we're not conceding that he was obnoxious. But there were interactions for many years. She worked there for many years. And so it strains credulity to suggest that saying back off with someone to someone who you've allegedly worked with for six years and have everyday contact, that they'd automatically know what it is you were talking about. Especially in a scenario like here where Mr. Arantes had testified. I guess you would say he says, I don't know what you're talking about. She says, you do know what I'm talking about. And you're saying. There was no further comment. He didn't know what she was talking about. And it would have been very simple to say, I'm talking about your advances, for example. You know, a couple words. But she didn't do that. And just like in a similar vein. But you're saying if she had done that, that would have been a protected activity? Well, that would at least arguably place the person, Mr. Arantes, on notice that she was objecting to what she perceived as sexual harassment. And if I just, if I may, quickly. It's similar to the letter that Ms. Corolli gave to Dr. Cohn in 2016. She says, I put everything in there so that she would know what I was complaining about. The letter makes no reference to sexual harassment. Now, if somebody sexually harassed you for six years, every day at work, according to her. And you send a complaint letter where you say I put everything in there, it would make reference. I think I understand the argument on the retaliation. So about the motion for a new trial. You're not appealing the district court's decision that you're not, you weren't entitled to a judgment as a matter of law, right? Correct. So you agree that the jury could have returned a verdict for Ms. Corolli, right? With respect to the underlying sexual harassment claims or the retaliation? No, the harassment claims. Well, could a jury have returned a verdict? Absolutely. In fact, it did. The second trial. That's exactly what had occurred. Human rights. New York City, human rights law. You're talking about just with respect to Title VII? No, I'm just saying that I don't think there was a finding of liability on federal or state. Correct. And with an award of nominal damages. But the- Well, anyway, I guess if a reasonable jury could have returned a verdict in her favor, why should you have a new trial? Like if the evidence wasn't so one-sided that you had to win, which you seem to be recognizing. Why respect the judgment of the jury if it could reach that conclusion? If the award was out of whack, you could move to remit the award, couldn't you? Correct. Or it could have been done sua sponte. So how would that have been sufficient? Well, the referee, who had a bird's eye view of the proceedings, felt that it was not. And to be clear, Your Honor, new trial motions are addressed to the discretion of the court. Appellant has not shown that that discretion was abused. That's the applicable standard. So the fact that reasonable minds could differ does not mean that she abused her discretion. She had an opportunity to observe the jury. There was a publication of an anonymous letter, no foundation, no declarant, unsigned. Why is it an abuse of discretion? I mean, let's say here the district court says the jury award was excessive. Let's say the jury award was just like $20,000 or something. Right. And the district court said, well, in my opinion, that's like way too much for what she testified to, and we're going to have a new trial. Right. That would be an abuse of discretion, wouldn't it be? You certainly, I think, would have a compelling argument. So then it's about the size of the award? Well, what Judge Cote did, with all respect, Judge, regarding the motion for a new trial, was specifically go through Second Circuit case law with respect to the three categories of emotional distress damages. Garden variety. But the jury doesn't get those categories, right? The jury wasn't thinking in terms of those categories. That's why we can permit a jury award. But what the jury, Judge Cote, makes clear in her rulings are that the publication of the anonymous letter, she believed, tainted the jury. There was so much hearsay and innuendo and inadmissible statements by the plaintiff that she felt it was improper. And even more so, Judge. Even if the jury hadn't returned what she viewed as an excessive damages award, she still would have granted a motion for a new trial? Or she would have been within her discretion to do so? Well, her discretion is her discretion. But here, the award was so egregious with respect to the evidence. Other than the anonymous letter in the first trial, there was very little evidence. She said there was two times that there was actual physical touch. Well, there's two specific instances, but she did testify that there were other instances. She testified in the most conclusory terms possible. It was every day for six years. I don't know what date it started. I don't know what it ended. One additional thing I just want to address with respect to Mr. Bergstein's statements. The mother never saw anything. There was all of her, the alleged sex harassment was completely uncorroborated and solely reliable on plaintiff's word. And, in fact, the mother said, he harassed us from day one, thereby supporting our position that this wasn't about sexual harassment but workplace grievances. She says, he harassed us from day one. And I asked her, I said, if he harassed you from day one, why a year or two later, and it lasted for the whole six years, why a year or two later did you bring your other two children or two of your other two children to come work there, including another daughter? That's not reasonable to suggest that a mother who was there to testify on behalf of her daughter would bring her other daughter within harm's way. But you're saying that the testimony wasn't credible and you got to challenge the credibility, but the jury could have credited what the mother had to say, right? Well, not with respect to things that occurred behind closed. The jury could have credited what the mother said if the mother had firsthand knowledge or got an opportunity to observe any of those things. She clearly says she did not. She says, I don't know what was going on in the room, but when my daughter came out, she was quite upset. That's not anything in support of alleged sex, right? That's in support of two people went in the room. Who knows? No one here or anyone else knows what goes on. That would support the inference that something troubling was happening in the room, right? Well, something troubling? I think we have your argument. Thank you very much, Mr. Williams. We'll turn back to Mr. Bergstein. Thank you, Your Honors. All right. Four points I'd like to make. Number one, when the plaintiff told Cohen, I will not subject myself to sexual advances, she's essentially telling Cohen that there's a quid pro quo problem going on in the workplace. And that's enough to make out a verbal protected activity. The issue of telling Mario to back off, I was hearing competing inferences about what that means. She told Mario, you know exactly what I'm talking about. This is context specific. She said, this is what you're doing to me. If the jury credits the testimony that Arantes was doing this to her, he was trying to get her into a room to be alone. He was kissing her. What do you think she was referring to when she told him to back off and you know exactly what I'm talking about? This is for the jury. On the new trial issue, inside the rooms, strong circumstantial evidence that this is Mario's modus operandi. The mother testified that she opened up the door. She saw Mario and the plaintiff, quote, very close physically. What were they doing in there? What is he doing with these women for 45 minutes, 30 minutes? The woman walks out with lipstick all over her face. You have the circumstantial jury charge with the rain and the umbrella that you have in Judge Sand's book. You can easily say to see a woman walk out of Say in response to the letter, that 2016 letter that is put to capture all the grievances and yet it speaks to kind of workplace It doesn't mention sex harassment. It does not mention at all. That's credibility. That's a great cross-examined point that you want to make a trial. Isn't it true? You wrote this long letter. It says nothing about harassment. Yes, but I told him over and over. This is what he's doing to me. And he told me that I was effing crazy. That's a credibility fight. Whether the letter is sufficiently clear that you can get judgment as a matter of law. You can't get summary judgment. Well, it's not about the letter being clear. You just said what your response to that would be is she made other statements aside from the letter. But the district court could have said the letter doesn't refer to sexual harassment, right? Right. But it's for the jury to decide whether the letter alone proves that she didn't make a complaint to Cohen when she testified that she verbally made the complaint to Cohen. So, again, this is what we have juries for. Let me talk about the damages because a huge part of the district court's ruling on new trial was that the damages were so high that we need a new trial on liability too. You know, $527,000 in pain and suffering for her damages is not excessive when you consider the nature of her testimony and what she went through as corroborated by her mother. This court has said that $500,000 is not excessive in a significant pain and suffering case. And this court said that in Sirubali and there's other cases that bring us to that number. It's not like they gave her $20 million in pain and suffering. $527,000 for five years of, quote, hell that she described, that's the jury's assessment of what it's worth to be put through this type of harassment. The $2 million in punitive damages, the district court misunderstood why the jury awarded punitives. District court said the jury awarded punitives because the company didn't have a sex harassment policy. That's not why the jury awarded punitives. They did that because every time or on numerous occasions when plaintiff told Dr. Cohen this is what's going on, he rebuffed her. He was deliberately indifferent and he said you're crazy, go back to work. Basically, I don't believe you. That allows the harassment to continue. This is why it went on for six years. The jury decided that is egregious enough under Title VII and it's reckless enough under the city law to justify a high punitive damages award. If we think $2 million is too much, have her remitted her. We see it all the time. But rarely do you see the drastic result we have here where you have an entirely new trial because the jury, which has no basis to know about the three-part matrix that's in play in this circuit, that the jury somehow awarded too much money as if they were given precise guidance on how much a case is worth. And we know that they're not giving that guidance. So. Thank you very much. Thank you. Mr. Burstein, the case is submitted.